# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STATIC CONTROL COMPONENTS, INC.,   )
                                    )
    Plaintiff,                  )
                                    )
                                    )
        v.                      )   Case No. 1:07CV00281
                                    )
INTELLIGENT OFFICE PRODUCTS, INC.   )
and REZA H. AHMADI, a/k/a           )
 "RAY AHMADI,                        )
                                    )
    Defendants.                 )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF MAGISTRATE JUDGE ELIASON

    This matter came before the undersigned United States Magistrate Judge Russell A. Eliason at a hearing conducted on May 30, 2008 in Winston-Salem, North Carolina. In a May 19, 2008 order, the Defendants were ordered to appear to show cause why judgment should not be entered against them and the Counterclaim dismissed. Entries of default had previously been made against both Defendants. Also, at the hearing, the Court considered Plaintiff's motion for summary judgment. Appearing for the Plaintiff was William L. London, General Counsel for Plaintiff, Static Control Components, Inc. The Defendants did not appear nor did any representative for the Defendants appear.

    After reviewing the record, including the Plaintiff's Motion & Memorandum for Summary Judgment and Supplemental Memorandum in

Support of Motion for Summary Judgment, the Undersigned hereby makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Static Control Components, Inc. ("Static Control") is a corporation organized and existing under the laws of North Carolina with its principal place of business in Sanford, Lee County, North Carolina. Static Control is a leading supplier of toner, parts and components for use in repairing and recycling laser printer toner cartridges ("cartridges"), a business often referred to as the cartridge remanufacturing industry. *Complaint, Paragraph 1.*

2. Defendant Intelligent Office Products, Inc. (hereinafter "IOP") is a corporation organized and existing under the laws of Texas with its principal place of business in Houston, Texas. IOP is a remanufacturer of cartridges. Remanufacturers take used cartridges, disassemble them, clean them, replace worn out components, and then rebuild the cartridges. The rebuilt or remanufactured cartridges are then refilled with toner. These remanufactured cartridges are sold at a discount to the price of a new original equipment manufacturer's (OEM) cartridge. *Complaint, Paragraph 2; Answer, Paragraph 2.*

3. Defendant Reza H. Ahmadi, a/k/a "Ray Ahmadi", ("Mr. Ahmadi") is a natural person who is a resident of Harris County,

-2-

Texas and resides in Houston, Texas.  Mr. Ahmadi is the owner of IOP.  *Complaint, Paragraph 3; Answer, Paragraph 3.*

4.    Initially, Mr. Ahmadi and his then partner, Mr. Thomas Havron ("Mr. Havron"), owned two companies, Intelligent Interface and a subsidiary which became IOP.  *(Ahmadi Dep. Vol. I  7: 7-25.)*[1] Intelligent Interface sold and serviced computers and printers. *(Sciba Dep. 6: 13-18.)*[2]  Mr. Ahmadi focused on servicing printers and computers while Mr. Havron focused on sales and running the remanufacturing part of the business which later became IOP. *(Sciba Dep. 10: 7-25.)*

5.    In 1994, Mr. Ken Sciba ("Mr. Sciba") was hired as production manager of the remanufacturing business.  Mr. Sciba had prior experience in remanufacturing and was later promoted to general manager of the business. *Id.*  Mr. Ahmadi had no experience in remanufacturing toner cartridges.  *(Sciba Dep. 26: 7-12.)*

6.    On March 6, 2001, IOP applied for a credit account with Static Control. The application for credit was done using Static Control's standard Credit Agreement ("the Agreement") and signed by Mr. Havron as President of the company.  The Agreement includes a copy of the standard "Static Control Terms and Conditions" ("the

---

[1] Excerpts from Reza H. Ahmadi Deposition Transcript Vol. I, Exhibit 1 to Plaintiff's "Memorandum of Law in Support of Motion for Summary Judgment."

[2] Excerpts from Kenneth Sciba, Jr. Deposition Transcript, Exhibit 2 to Plaintiff's "Memorandum of Law in Support of Motion for Summary Judgment."

-3-

Terms") which are also printed on every Static Control invoice. See *Affidavit of Renee Haire at Paragraphs 5 and 6.*[3]

7.  By signing the Agreement, IOP agreed "to abide by the terms and conditions set out on all invoices which may be amended from time to time." IOP also agreed that "all charges incurred after the extension of credit shall be considered due and payable according to the terms on the invoice." See *Affidavit of Renee Haire at Paragraph 6.*

8.  The Terms, as printed on all of Static Control's invoices, provide that "Any outstanding balance not paid on time shall bear interest at the rate of 1 ½% per month, compounded monthly." See *Affidavit of Renee Haire at Paragraph 5.*

9.  In 2003 Mr. Ahmadi purchased Mr. Havron's interest in IOP. *(Ahmadi Dep. Vol. I 8: 9-11.)* Mr. Ahmadi's wife, Teresa Cox Ahmadi became president of IOP about that time. *(Cox-Ahmadi Dep. 6: 5-9.)*[4] In December of 2004, Mr. Sciba left IOP to take a position with another remanufacturer. *(Ahmadi Dep. Vol. I 17:1-12.)* When Mr. Sciba was the general manager, IOP purchased various

---

[3] Ms. Haire is the Credit Control Coordinator at Static Control. She filed an affidavit (docket no. 48), including copies of the Agreement (Ex. B) and the Terms (Ex. A), Ahmadi's guarantee (Ex. C), a summary of invoices due (Ex. D), and other documents. She has another affidavit attached to Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment as Exhibit 9.

[4] Excerpts from Teresa Cox-Ahmadi Deposition Transcript, Exhibit 3 to Plaintiff's "Memorandum of Law in Support of Motion for Summary Judgment"

-4-

products from Static Control, including universal toners. *(Sciba Dep. 18: 2-7.)* During the time that Mr. Sciba was IOP's general manager, IOP received few complaints about the quality of the products produced by IOP. *(Sciba Dep. 25: 3-21.)* Up until the time Mr. Sciba left, Mr. Ahmadi had no involvement in the remanufacturing of the toner cartridges.

10. After Mr. Sciba left, Mr. Ahmadi decided to make a number of significant changes. He replaced Mr. Sciba with a Mr. Torres. Mr. Torres had been employed by IOP as a sales person prior to Mr. Sciba leaving IOP. Mr. Torres had been fired by Mr. Ahmadi for poor sales performance, and then re-hired by Mr. Ahmadi to be the general manager over both sales and production. *(Sciba Dep. 34: 2—35:10.)* Mr. Torres had no manufacturing experience. *(Sciba Dep. 36: 11-25.)*

11. Mr. Ahmadi and Mr. Torres changed the cartridge remanufacturing process from an assembly line (where each employee repeated the same function over and over) to where several employees examined each cartridge to a system where cartridges were remanufactured entirely by one employee. *(Cross Dep. 23:4-*21[5]*; Ahmadi Dep. Vol. I 20:5-18.)* In 2005, IOP began to receive an

---

[5] Excerpts from Vicki Cross Deposition Transcript, Exhibit 4 to Plaintiff's "Memorandum of Law in Support of Motion for Summary Judgment."

increasing number of complaints from its customers as to the quality of the cartridges that had been purchased from IOP.

12.   The defects in IOP's cartridges were related to the build of the cartridges, not the quality of the components purchased from Static Control.   A number of the complaints received by IOP involved cartridges that leaked toner.   Leaking occurs when the cartridge has not been rebuilt correctly, and is not a function of the quality of the toner.   *(Espino Dep. 32:25-33:24.)*[6]   IOP also sold some cartridges without having any toner in them at all.   *Exhibit 6 to Plaintiff's "Memorandum in Support of Motion for Summary Judgment".*   In addition, IOP changed the quality of the components that it used, reusing the components in the used cartridges bought from brokers that it had previously replaced with new aftermarket components.   *(Cross Dep. 15:17-16:5; Espino Dep. 19: 2-23.)*   Furthermore, IOP bought the wrong types of used cartridges from brokers and it tried to make them work anyway.   *(Espino Dep. 9: 4-24.)*   Finally, IOP sold customers lower quality non-virgin (previously used) cartridges when it advertised that the cartridges were made from higher quality virgin (not previously used) cores.   *(Espino Dep. 11: 5-12:15.)*

---

[6] Excerpts from Yvonne Espino Deposition Transcript, Exhibit 5 to Plaintiff's "Memorandum of Law in Support of Motion for Summary Judgment."

13.  Mr. Ahmadi's changes impacted IOP's business in other ways.  Mr. Ahmadi increased the price of IOP's cartridges without warning to customers.  *(Cross Dep. 15:7-15; Espino Dep. 19: 2-12.)* IOP failed to stock enough inventory to support customers' requests for cartridges.  *(Espino Dep. 16: 5-25.)*  In one instance, Mr. Ahmadi was rude to a good customer.  *(Espino Dep. 19: 16-23.)*  Mr. Ahmadi complained that IOP's sales people were not selling enough products for him to be able to pay Static Control.  *(Espino Dep. 21: 13-18.)*  As a result of these business problems, IOP began to lose some of its customers and its revenues declined.  *(Espino Dep. 19:2-21:18.)*

14.  In 2005 IOP fell behind in its payments to Static Control.  On September 30, 2005, in an effort to convince Static Control to continue to extend IOP additional credit, Mr. Ahmadi knowingly and willingly executed a Personal Guarantee in which he pledged his personal resources to cover any debt incurred by IOP to Static Control.  *(See Exhibit 7 to Plaintiff's "Memorandum in Support of Motion for Summary Judgment"; Ahmadi Dep. Vol. I 108:1-109:25).*  When he signed the Personal Guarantee, IOP was purchasing 85% of its supplies, including toner, from Static Control.  Mr. Ahmadi, at the time he signed the guarantee, did not raise any complaints regarding the quality of components or toner IOP purchased from Static Control.  *(Affidavit of Renee Haire.)*

-7-

15.   In his deposition Mr. Ahmadi answered questions regarding the Personal Guarantee as follows:

"Q.   Did you sign Exhibit Number 2 in part to help allay those concerns of Static Control, to satisfy those concerns?

A.   To be honest with you, I'm the one offered this.

Q.   Okay.  You offered this to?

A.   I offered this to Renee.  I would guarantee the moneys owed, I would take care of...

Q.   At the time you made that offer, did you intend to pay the amount that was then due?

A.   Yes.

Q.   And did you intend to pay the amount that would be due in the future for additional products that they sold you on credit?

A.   Yes."

*(Ahmadi Deposition Volume I 109:7-21)*

In response to "Plaintiff's First Request for Admissions", Mr. Ahmadi admitted that he knowingly and willingly signed the Personal Guarantee (Request Nos.5 & 6), that he did so before a Notary Public in the state of Texas (Request No. 7) and that he never provided Static Control with written notice of termination of his obligation to guarantee payment for Static Control products shipped to IOP after September 30, 2005 (Request No. 8).

-8-

16.   Despite the signing of the guarantee by Mr. Ahmadi, IOP continued to fall behind on payments for newly ordered products. IOP's only payments after the guarantee was signed were four $5,000 payments in early 2006 in an effort to catch up on its existing debt.   Mr. Ahmadi continually represented to Static Control that IOP was in the process of obtaining new business or new financing that would enable it to pay the monies it owed to Static Control. Mr. Ahmadi did not assert quality concerns as a reason for not making required payments.   See *Affidavit of Renee Haire at Paragraph 9.*

17.   In August of 2006, Static Control stopped shipping product to IOP.   Static Control made demand of IOP for payment in September of 2006, but IOP failed and refused to pay for the products.   Static Control turned the matter over to a collection agency in an effort to collect the debt.   See *Affidavit of Renee Haire at Paragraph 10.*

18.   At the end of 2006, IOP owed Static Control the principal amount of $486,106.66.   This principal amount was the amount due and owing for products purchased by IOP from Static Control that were delivered to and used by IOP, but not paid for.   (That principal amount also included six processing fees for returned checks.   The charging of this fee is allowed by N.C.G.S. 25-3-506. While these fees are part of the principal, no interest has been

-9-

charged on these fees.)  An invoice accompanied each order sent to IOP.[7]  <u>See</u> *Affidavit of Renee Haire at Paragraph 11.*

19.  Static Control filed a Complaint on March 6, 2007 in the General Court of Justice, District Court Division, Lee County, North Carolina seeking judgment in the amount of $486,106.66, representing the unpaid balance due and owing for products that Static Control had sold and delivered to IOP together with accrued interest and costs as allowed by its invoices.  Static Control sought a similar judgment against Mr. Ahmadi based upon his personal guarantee of IOP's debt to Static Control.

20.  Both the Agreement and the Terms require IOP to pay interest on any unpaid balance at the rate of 1 ½% per month, compounded monthly.  For the purpose of calculating prejudgment interest, the due date is the date on which the complaint was filed in this case, March 6, 2007 (although it could have been, no interest was added to the principal amount prior to this date).  The interest is calculated, in accordance with the Terms, at the rate of 1 ½% per month, compounded monthly.  The amount on which prejudgment interest was charged is $485,956.66.  The amount of prejudgment interest, from March 2007 until the end of May 2008, totals $121,601.94.  <u>See</u> *Affidavit of Renee Haire at Paragraph 12.*

---

[7] A list of the unpaid invoices is attached as Exhibit D to the Affidavit of Renee Haire and is fully incorporated herein by reference.

-10-

21. IOP and Mr. Ahmadi removed the case to this Court on April 11, 2007. They also filed an Answer to the Complaint in which IOP alleged several counterclaims against Static Control based on its allegation that products sold by Static Control to IOP were defective.

22. IOP does not dispute that it purchased supplies and toner from Static Control nor does IOP dispute that it has failed to pay Static Control for all the supplies and toner it purchased. *Ahmadi Deposition Volume I 111:1-112:15* Rather, IOP claims that some of the products and toner it purchased from Static Control were defective and that it therefore does not have to pay for them. *(Ahmadi Dep. Volume II 176:16-179:11.)*[8]

23. IOP, when given the chance to do so, was completely unable to describe how any defects in Static Control's components were related to cartridges returned to IOP by its customers. In response to interrogatories submitted by Static Control, IOP responded as follows:

> **"Interrogatory No.6.** With respect to each returned cartridge accounted for in response to Interrogatory No.4 above which, if any, of the specified "defect(s)" does IOP attribute to the toner(s) purchased by IOP from Static Control? Provide each and every reason why IOP attributes such cartridge returns to the toner(s) purchased from Static Control.

---

[8] Excerpts from Reza H. Ahmadi Deposition Transcript Vol. II, Exhibit 10 to Plaintiff's "Memorandum of Law in Support of Motion for Summary Judgment."

***Answer:*** *Plaintiff is unable to respond to this interrogatory since typically customers did not specify the type of defect.*

**Interrogatory No.7.** With respect to each returned cartridge accounted for in response to Interrogatory No.4 above, which, if any, of the specified "defect(s)" does IOP attribute to any component *other than* toner(s) purchased by IOP from Static Control? Provide each and every reason why IOP attributes such cartridge returns to the identified components purchased from Static Control.

***Answer:*** *Plaintiff is unable to respond to this interrogatory since typically customers did not specify the type of defect.*

**Interrogatory No.8.** If the answer to Interrogatory No.7 above is other than "none", please identify the allegedly defective component by product number or SKU for each such returned cartridge.

***Answer:*** *Plaintiff is unable to respond to this interrogatory since typically customers did not specify the type of defect."*

24. Additionally, IOP was unable to establish or quantify its damages. In response to interrogatories submitted by Static Control, IOP failed to provide any proof of damages or any damage estimate:

"**Interrogatory No.1.** What is the amount of damages claimed by IOP against Static Control? Please provide both the amount of damages that IOP claims against Static Control and the basis for the calculation of the amount provided.

***Answer:*** *The amount of damages claimed depends upon the measure of damages adopted by the Court for use in this case. These damages may include either: lost sales revenues from defective returns of cartridges or lost profits due to defective product returns."*

25. On February 8, 2008, counsel for IOP and Mr. Ahmadi, Michael Patrick ("Mr. Patrick"), filed a motion to withdraw

-12-

contending that he had not been paid as the defendants had contracted to do.

26. On March 13, 2008, Plaintiff filed a motion for Summary Judgment requesting that the Court find IOP and Mr. Ahmadi jointly and severally liable to Plaintiff in the amount of $486,106.66 plus prejudgment interest of $140,637.74 and post judgment interest and costs; that the personal guarantee signed by Mr. Ahmadi is a guaranty of payment and that Mr. Ahmadi, personally and individually is immediately liable to Static Control for the amount owed by IOP to Static Control and that the Court dismiss IOP's Counterclaim.

27. On April 14, 2008, the Court provisionally granted Mr. Patrick's motion to withdraw with respect to his representation of Mr. Ahmadi. Mr. Patrick's representation was limited "to the extent that he need not perform any active representation for Defendant Ahmadi except to receive pleadings, motions, orders and other paperwritings from the Court and Plaintiff." Mr. Ahmadi himself was instructed to, within twenty days, either substitute new counsel or make an entry of appearance to represent himself. Mr. Ahmadi has subsequently failed to either retain substitute counsel of make an entry of appearance.

28. In the same April 14, 2008 order, the Court provisionally granted Mr. Patrick's motion with respect to his representation of

-13-

IOP, but limited his representation to appearing "in court as directed, and receive all papers in this action on behalf of Defendant IOP and transmit them to Defendant IOP at its last known address." The Court ordered IOP to immediately retain new counsel and to have counsel enter an appearance within twenty days. IOP has subsequently failed to retain substitute counsel.

29. On May 19, 2008, the Court entered an Order directing the Clerk to make entries of default against both defendants for their failure to comply with the Court's April 14, 2008 order. The Court also ordered the parties to appear before the Court on May 30, 2008 for the Defendants to show cause why default judgment should not be entered against them, why Defendant IOP's Counterclaim against Plaintiff should not be dismissed for failure to prosecute and failure to obey court orders, and why Plaintiff's Motion for Summary Judgment should not be granted.

30. On May 20, 2008, the Clerk, pursuant to the Court's order, entered default against IOP and Mr. Ahmadi.

31. On May 29, 2008, Mr. Ahmadi faxed the Court and acknowledged that he had received the Court's May 19th order. Mr. Ahmadi also advised that he was aware of the May 30th hearing. In addition, Mr. Ahmadi stated that neither he nor IOP had retained substitute counsel. Finally, Mr. Ahmadi stated that he would not

-14-

be able to attend the hearing and that he understood that the hearing would take place without him.

32. On May 30, 2008, the Court held a hearing for the defendants to Show Cause why judgment should not be entered against them and Defendant IOP's Counterclaim dismissed. The defendants did not appear.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and has personal jurisdiction over all the parties to this case.

2. Venue in this jurisdiction is proper under 28 U.S.C. § 1391.

## I. SUMMARY JUDGMENT STANDARD

3. Summary judgment is appropriate where an examination of the pleadings, affidavits and other materials before the Court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23; 106 S.Ct. 2548, 2552 (1986). The "material facts" are those identified by controlling law as essential elements of claims asserted by the parties. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248; 106 S.Ct. 2505, 2510 (1986).

-15-

4. When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586; 106 S.Ct. at 2511. A mere scintilla of evidence is insufficient to circumvent summary judgment. *Anderson, 477 U.S. at 252; 106 S.Ct. at 2511.* Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational Trier of fact could find for the nonmoving party. *Id.* at 248-49; 106 S.Ct. at 2511. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive section. *Mitchell v. Data General Corp.,* 12F.3d. 1310, 1315-16 (4th Cir. 1993)

## II. THERE IS NO GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO PLAINTIFF'S CLAIMS

### A. IOP Breached its Contract to Pay for the Goods.

5. The agreement between IOP and Static Control is governed by North Carolina law. In order to prevail on a breach of contract claim under North Carolina law, Static Control must establish (1) the existence of a valid contract and (2) breach of the terms of that contract. *Poor v. Hill,* 138 N.C. App. 19, 530 S.E.2d 838 (2000). In addition, a breach of contract is actionable only if the breach was material in nature. *Long v. Long,* 160 N.C. App. 664,

-16-

588 S.E.2d. 1 (2003) (citing *Fletcher v. Fletcher,* 123 N.C. App. 744, 474 S.E.2d. 802 (1996), *disc. review denied,* 345 N.C. 640, 483 S.E.2d. 706 (1997).

6. Static Control has established the existence of a valid contract. IOP admits that it purchased "numerous products" from SCC (*Answer, Paragraph* 7). These purchases were made pursuant to a credit account which has terms and conditions (*Affidavit of Renee Haire at Paragraph 5, 6 and Exhibits*) and the purchases were controlled by the terms on the invoices (*Affidavit of Renee Haire at Paragraph 6*). Together, the credit account and the invoices for products delivered to IOP constitute a valid, enforceable contract for the sale of goods between the parties.

7. IOP breached the terms of the contract. As noted above, IOP admits that it purchased "numerous products" from Static Control. IOP did not dispute that it did not pay in full for these purchases. This refusal to pay continued despite repeated written and verbal demands from Static Control for IOP to pay as agreed (*Affidavit of Renee Haire at Paragraphs 10 and 11*).

8. This breach by IOP is material in nature. A breach is material if it "substantially defeats the purpose of the agreement or goes to the very heart of the agreement or can be characterized as a substantial failure to perform". *Long, supra.* In a contract for purchase of goods, the failure to pay for the goods that are

-17-

the subject of the agreement is a material breach. *Sports Quest, Inc. v. Dale Earnhardt, Inc., Nos. 02 CVS 0140, 01 CVS 2200, 2004 WL 254729, 2004 NCBC 3 (N.C. Super. Feb. 12, 2004)(not reported in S.E.2d.)* Thus, IOP's failure to pay for the products that it purchased from Static Control is a material breach of the sales contract.

9. As a result of this breach, Static Control has been damaged by not being paid for products that were furnished to IOP. IOP does not dispute the amount of the claim; it only makes claims about the quality of Static Control's products. *(Ahmadi Dep. Vol. I 111:23-112:1.)*

10. IOP is liable for these damages, with prejudgment interest. IOP owes Static Control the principal amount of $486,106.66 for the products purchased by IOP from Static Control that were delivered to and used by IOP but were not paid for. This includes $150 for service fees for worthless checks which Static Control is authorized to assess by N.C.G.S. 25-3-506. An invoice accompanied each order sent to IOP. (<u>See</u> *Affidavit of Renee Haire at Paragraph 12.)*

11. Each invoice contained the Terms which specify that "any outstanding balance not paid on time shall bear interest at the rate of 1 ½% per month, compounded monthly". (<u>See</u> *Affidavit of Renee Haire at Paragraph 5 and 12.)* The due date is calculated as

the date of the filing of the complaint in this action, which is March 6, 2007. Prior to that date, no interest was charged on the debt. The balance on which interest was calculated is $485,956.66. The amount of the prejudgment interest, from March 2007 until the end of May 2008, is $121,601.94. (See *Affidavit of Renee Haire at Paragraph 12.)*

**B. Mr. Ahmadi is Personally Liable for IOP's Debt to Static Control.**

12. The Personal Guarantee signed by Mr. Ahmadi is a valid agreement immediately enforceable by Static Control on account of IOP's failure to pay its debt.

13. The Personal Guarantee signed by Mr. Ahmadi is a guaranty of payment. "A Guaranty of Payment is an absolute promise by the guarantor to pay the debt at maturity if it is not paid by the principal debtor." *EAC Credit Corp. v. Wilson*, 281 N.C. 140, 187 S.E.2d 752 (1972). Mr. Ahmadi admits signing the personal guarantee. (*Answer, Paragraph 9; Ahmadi Dep. Vol. I 108:8-109:21.*) In the agreement, the promise to pay amounts owed by IOP to Static Control is absolute and unconditional:

"*I, Ray Ahmadi, do hereby personally guarantee any and all debts incurred by Trade Debtor (IOP) to Static Control Components, Inc.*"

-19-

This contract language is unconditional and constitutes a guaranty of payment.

14. Because Mr. Ahmadi signed the Personal Guarantee, additional credit was extended to IOP, credit which otherwise would not have been extended. *(Affidavit of Renee Haire at Paragraph 9.)* This grant of additional credit is sufficient consideration to support the guaranty contract. In a guaranty contract "a consideration moving directly to the guarantor is not essential. The promise is enforceable if a benefit to the principal debtor is shown". *Investment Properties of Ashville, Inc. v. Norburn,* 281 N.C. 191, 188 S.E.2d 342 (1972).

15. With this guaranty of payment, Mr. Ahmadi is liable for IOP's debts to Static Control immediately upon IOP's failure to pay. *EAC Credit Corporation v. Wilson, supra.*

## III. IOP HAS NO CLAIM FOR DEFECTIVE PRODUCTS UNDER CONTRACT OR TORT

16. IOP, in its Counterclaim, asserts the claims of breach of warranty, fraud and unfair trade practices. These claims are all based on IOP's allegation that the products sold by Static Control to IOP were defective in some unspecified way. There is no material evidence to support these claims.

17. Summary judgment is appropriate if there are no genuine issues of fact. A party cannot create a genuine issue of material

-20-

fact through mere speculation or compilation of inferences. Objective evidence is needed. <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135 (4th Cir. 2008).

18. IOP makes no real attempt to try and prove its accusations. It did not submit any evidence showing Plaintiff's product was defective and caused Defendant IOP damage. IOP did not retain an expert, it did not test any of Static Control's products, and it did not quantify its alleged damages in any way. IOP put forward no evidence to show that any Static Control products had changed in quality after 2005. Instead, IOP merely speculates that this could have been the cause of its problems.

19. The evidence clearly shows that IOP successfully used Static Control's products through the end of 2004 to build their business. Then, after IOP's general manager left in December of 2004, IOP began to run into trouble. Plaintiff's evidence shows that the quality of IOP's cartridges decreased due to unwise business decisions made by the new management. Among other things, IOP changed the way it built cartridges, increased the number of used components that it reused instead of replaced, and increased its prices without warning. Defendants fail to show that the products Static Control sold to IOP caused IOP's business problems.

20.  The Court concludes that IOP's claims were made merely for the purpose of delaying Static Control's collection of the sums due to it.

## IV.  FED. R. CIV. P. 4(c) DISMISSAL OF COUNTERCLAIM AND DEFAULT JUDGMENT PURSUANT TO FED. R. CIV. P. 55

21.  By Defendants' failure to comply with the instructions of this Court in its Order of April 14, 2008 with respect to appearing in this action or to obtain substitute counsel to appear on their behalf, both IOP and Ahmadi have violated Fed. R. Civ. P. 41(c) by disobeying an order of the Court and, at the same time, shown that the Counterclaim cannot, and will not, be prosecuted.  The Counterclaim ought to be dismissed pursuant to Fed. R. Civ. P. 41(c) with prejudice because of a failure of IOP to prosecute and its failure to obey a court order.  Four factors should be considered in that regard, which are: (1) the degree of the plaintiff's personal responsibility; (2) the existence of a protracted history of deliberately proceeding in a dilatory fashion; (3) the amount of prejudice to the defendant caused by the delay; and (4) whether less drastic sanctions are available.  Doyle v. Murray, 938 F.2d 33, 34 (4th Cir. 1991); Herbert v. Saffell, 877 F.2d 267, 270 (4th Cir. 1989).  Plaintiff, as well as the Court, has the right to have cases moved along the docket without undue delay.  Pacific Indemnity Company v. United States, 66 F.R.D. 493

-22-

(E.D.N.C. 1975). Defendants have stated they would not appear in this Court to prosecute the IOP Counterclaim. They are personally responsible for the delay and the prejudice to Plaintiff. They have not submitted any evidence in support of the claim. All this shows that there are no lesser drastic sanctions available, aside from dismissal.

22. In like fashion, by failing to appear in this action, and by disobeying an order of the Court, the two Defendants have also caused an entry of default to be lodged against them. Pursuant to Fed. R. Civ. P. 55, a default judgment may be entered against them.

### RECOMMENDATION FOR JUDGMENT

Based on the above Findings of Fact and Conclusions of Law**,**

**IT IS HEREBY RECOMMENDED** that an order be entered that:

1. Plaintiff's Motion for Summary Judgment (docket no. 32) be granted, and a default judgment based on the entry of default be entered against Defendants Intelligent Office Products, Inc. and Reza H. Ahmadi, a/k/a "Ray Ahmadi," and that judgment against said Defendants be entered holding them jointly and severally liable to Plaintiff Static Control Components, Inc. in the amount of $486,106.66, plus prejudgment interest in the amount of 1½% per month, compounded monthly, calculated on the amount of $485,956.66 from March 6, 2007 to the date of judgment, together with the costs of this action.

2.    Plaintiff's Motion for Summary Judgment seeking dismissal of Defendant IOP's counterclaims against Plaintiff (docket no. 32) be granted, and also finding dismissal of the counterclaim appropriate under Fed. R. Civ. P. 41(c), that the Counterclaim be dismissed with prejudice.

**IT IS FURTHER RECOMMENDED** that Defendant Intelligent Office Products, Inc. and Defendant Reza H. Ahmadi be ordered to return all documents or materials belonging to Static Control Components, Inc. to it within sixty days.

This the 1st day of July, 2008.


_____
United States Magistrate Judge

–24–